UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LORI MORGAN,<br><br>Defendant. | Case No. 24-CR-232 (RC) |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

In July 2020, Defendant Lori Morgan successfully applied for $150,000 in COVID-19 relief aid on behalf of a fictitious agricultural business. The defendant applied for these funds, not because she wished to use the money for a struggling business, but because she wished to use that money for herself. Upon receipt of the relief aid the defendant proceeded to do just that, spending the money at retail stores, on travel, on automotive repair expenses, and on debt collection payments. For her conduct, the government is recommending a sentence of six months incarceration, followed by six months of community confinement or home detention, followed by a term of three years of supervised release. The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits the following memorandum in support of its recommendation.

**I.      PROCEDURAL BACKGROUND**

On May 15, 2024, a grand jury returned a six-count indictment charging the defendant with Wire Fraud, in violation of 18 U.S.C. § 1343. *See* ECF No. 1. On June 12, 2024, the defendant was arrested and subsequently arraigned on the indictment. On October 1, 2025, the defendant pled guilty to Count One of the Indictment. Sentencing is scheduled for Wednesday, February 18, 2026, at 10:00 a.m.

## II.     FACTUAL BACKGROUND

In support of her plea of guilty, the Defendant agreed to and acknowledged the following factual proffer.

1. Beginning in at least July 2020, and continuing through at least December 2020, in the District of Columbia and elsewhere, the defendant, Lori Morgan, knowingly devised, intended to devise, and participated in a scheme and artifice to defraud and to obtain, or cause to be obtained, money and property by means of materially false or fraudulent pretenses, representations, or promises (the "scheme to defraud").

2. It was a goal of the scheme to defraud that Morgan would fraudulently obtain or cause to be obtained, money or property, namely, funds Economic Injury and Disaster Loan ("EIDL") program administered by the Small Business Administration ("SBA").  By way of background, in response to the COVID-19 pandemic, the SBA offered certain entities, including small business owners, Economic Injury Disaster Loans ("EIDL").  These loans were provided directly from the SBA and were low-interest, fixed-rate, long-term loans. EIDL loan proceeds could be used for working capital to make regular payments for operating expenses, including payroll, rent/mortgage, utilities, and other ordinary business expenses, and to pay business debt.

3. It was part of the scheme to defraud that Morgan made false and fraudulent statements on her EIDL application and related documents, including erroneous statements about the nature, size, and existence of the fictitious business for which she sought the EIDL funds, and promises to use the EIDL funds for authorized EIDL expenses.  By submitting these applications and documents through an online portal containing these false representations, Morgan caused interstate wire transmissions.  By making these false

and fraudulent promises, Morgan induced the SBA to approve her EIDL loan application and disburse nearly $150,000 into her AFCU personal checking account ending in 7385. Morgan then spent and caused to be spent these EIDL funds on unauthorized personal expenses by withdrawing the funds from AFCU by means of ATM withdrawals, branch withdrawals, and debit card purchases.

4. More specifically, or about July 2, 2020, Morgan submitted one EIDL application, with EIDL Application No. 3308177431, under the name of business "Lori morgan." Morgan falsely claimed on the EIDL application that she owned 100 percent of a sole proprietorship "Agriculture" business named "Lori morgan" that was opened on February 3, 2013, was operated out of her apartment, and had ten employees and gross revenues of $7,500,000 for the twelve months preceding January 31, 2020. In reality, no such business ever existed and Morgan knew that each of the statements made on the application were false.

5. On or about July 8, 2020, Morgan electronically signed a Loan Authorization and Agreement for Application No. 3308177431, agreeing that she would use the proceeds of the loan solely as working capital to alleviate economic injury caused by disaster. In so doing, Morgan agreed to be bound by the stated terms and conditions during the term of the EIDL loan. Morgan further certified under penalty of perjury that she was authorized to apply for and obtain a disaster loan on behalf of the Borrower in connection with the effects of the COVID-19 emergency.

6. On or about July 8, 2020, as a result of the reliance on the false representations Morgan made in EIDL Loan Application No. 3308177431 and the accompanying Loan Authorization and Agreement, the SBA approved the requested EIDL. That same day, the

SBA disbursed $149,900 in EIDL funding to Morgan's AFCU account ending in 7385 (pursuant to the Loan Authorization and Agreement, a third-party Uniform Commercial Code handling charge of $100 was deducted from the loan amount of $150,000 prior to disbursement). The funding posted to Morgan's AFCU account ending in 7385 on or about July 9, 2020. Prior to the wire transfer, the account contained $0.39.

7.   Morgan spent and caused to be spent the EIDL funds for the personal benefit of herself and others, and on payments and purchases not permissible under the EIDL program, including, but not limited to, cash withdrawals at ATMs and branch counters, purchases at retail stores, CashApp transfers to other individuals, automotive repair expenses, debt collection payments, restaurants, and travel to Atlantic City, New Jersey and Las Vegas, Nevada. On December 31, 2020, the ending balance on Morgan's AFCU account ending in 7385 was $829.09.

*See* ECF No. 19, Statement of Offense in Support of Guilty Plea.

## III.   DISCUSSION AND APPLICATION OF U.S. SENTENCING GUIDELINES AND 3553(a) FACTORS

A.   <u>Generally Applicable Legal Principles</u>

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). See *United States v. Gall*, 128 S. Ct. 586, 596 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

  (3) the kinds of sentences available;

  (4) the kinds of sentence and the sentencing range established for –

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

      (i) issued by the Sentencing Commission ...; and

      (ii) that, . . . are in effect on the date the defendant is sentenced; ...

  (5) any pertinent policy statement –

    (A) issued by the Sentencing Commission ... and

    (B) that, . . . is in effect on the date the defendant is sentenced.

  (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

  (7) the need to provide restitution to any victims of the offense.

  B. <u>Guidelines Calculations</u>

Turning to 3553(a)(4)(A), for the reasons set forth in its response to the Pre-Sentence Investigation Report (hereinafter, "PSR"), the government agrees with the calculations of U.S. Probation regarding the defendant's Total Offense Level under the U.S. Sentencing Guidelines (hereinafter, "Guidelines"), with the exception of the two-level enhancement under USSG §2B1.1(b)(12), for the reasons it has already stated on the record in its January 27, 2026 letter to

USPO. The government agrees with USPO's calculation of the defendant's criminal history. As such, the government's calculations of the Defendant's sentencing range under the USSG differ from that of USPO's by one offense level.

1. *Total Offense Level*

The Guideline for a violation of 18 U.S.C. § 1343 is § 2B1.1, which provides for a base offense level of 7 in cases such as this one in which the statutory maximum is at least 20 years' incarceration. *See* PSR at ¶ 17. In addition, because the amount which the Defendant misappropriated is $148,900, the loss amount is greater $95,000, but less than $150,000, which results in an 8-level increase of the base offense level. *See id.* at ¶ 18. As noted above, the United States disagrees with the application of the specific offense characteristic involving 18 U.S.C. § 1040 and stands by the arguments made in its January 27, 2026 letter to USPO.[1] That leaves an adjusted offense level of 15. Furthermore, in light of the defendant's guilty plea prior to trial, she has demonstrated acceptance of responsibility, entitling her to two-level decrease. *Id.* at ¶ 25. As such, the defendant's Total Offense Level is 13.

2. *Criminal History*

The government agrees that the Defendant has one prior adult conviction for Driving a Vehicle Under the Influence of Alcohol and as such has a criminal history score of one, resulting in the Defendant being in Criminal History Category ("CHC") I.

3. *USSG Range*

In CHC 1, with a Total Offense Level of 14, the defendant's Guidelines range is 12-18 months in Zone C. In Zone C, the minimum term may be satisfied by a sentence of imprisonment

---

[1] The government further notes that in *U.S. v. Chen*, 24-cr-50, the United States did not ultimately seek to apply the enhancement at issue in this case.

or a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention, provided at least one-half of the minimum term is satisfied by imprisonment. *See* USSG § 5C1.1(d).

    C.    <u>Recommendation</u>

After calculating the applicable Guidelines range, the Court next considers all of the applicable factors set forth in 18 U.S.C. § 3553(a), noted *supra* at III.A. Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007). The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The United States recommends that the Court sentence the defendant to a term of six months incarceration followed by six months of community confinement or home detention in accordance with U.S.S.G. § 5C1.1(d)(2). Additionally, the government recommends that the Court sentence the defendant to a term of three years of supervised release. Finally, the government recommends that the Court order the defendant to pay restitution in the amount of $148,900.

        1.  *Nature and Circumstance of the Offense*

The Defendant's conduct in this case was deeply troubling. She falsely represented to the SBA that she would use $148,900 in public EIDL money designed to help small businesses stay

afloat during a global pandemic for the benefit of her own small business, but instead quickly put those funds in service of the only goal she ever had: her own self-enrichment.

By way of brief background, the EIDL program is a disaster relief program administered by the SBA that predates the COVID-19 pandemic. EIDLs are designed to provide economic relief to businesses that are currently experiencing a temporary loss of revenue due to a disaster. An EIDL provides loan assistance, including up to $10,000 advances, for eligible entities. The EIDL proceeds can be used to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the disaster not occurred. However, such loan proceeds are not intended to replace lost sales or profits or be used for expansion of a business.

On July 2, 2020, Lori Morgan applied for an EIDL from the SBA. The application listed her business as "Lori morgan," with a primary business address of 1776 Mississippi Avenue, SE, Washington, DC 20020, which was Morgan's home address. The application claimed she ran a sole proprietorship "agriculture" business with 10 employees and gross revenues of $7,500,000 for the prior year.

In reality, the address of 1776 Mississippi Avenue, SE is a residential apartment unit located in the Huntington Village apartment complex. The defendant's apartment was only 1,090 square feet, far too small to host 10 employees and support a gross revenue stream of millions of dollars. Despite this, on July 8, 2020, the defendant electronically signed documents accepting the EIDL loan of $150,000. In doing so, the defendant affirmed that she was not engaged in any illegal activity and that the information in the application was true and correct under penalty of perjury. As a condition of receiving this loan, the defendant was required to affirm that she understood that

misapplication of proceeds of an SBA disaster loan subjects the borrower to criminal, civil, and administrative penalties.

The EIDL funds were disbursed to an AFCU personal checking account controlled by the defendant on July 8, 2020 and were deposited into the account the next day. At the time of the deposit, the account had a balance of only $0.39. The account had this same balance as of July 1, 2020, the date Morgan submitted the EIDL application. The day after receiving the EIDL proceeds, the defendant requested an increase on her credit card limit. Within a week of receiving the EIDL funds, more than $30,000 exited the defendant's account. By the beginning of September 2020, more than half the EIDL funds had been spent by the defendant.

On October 23, 2020 – over three months after the defendant received the EIDL disbursement to her AFCU account – the defendant told an employee of the credit union where she was conducting her banking that she is a daycare provider and "will be" opening her own daycare. This conversation appeared to be in response to an account note from 17 days prior, noting, per a compliance specialist, to ask the defendant her occupation; if the occupation is businessowner, the nature of the business; and the purpose behind her recent activity.

The defendant spent most if not all of the fraudulently obtained funds on purchases and withdrawals not permissible under the EIDL program. During the time the defendant was spending the EIDL funds she had only approximately $2,229 deposited into her account. Therefore, it is clear that the majority of the defendant's expenditures were made with EIDL funds. Below is a breakdown of how the defendant spent the majority of the money in her account[2]:

---

[2] The expenditures listed in this analysis total $170,642.01, which is approximately $20,000 more than the EIDL the defendant received. This difference is due to other credits in the defendant's account, such as from her employment at Instacart, transfers from her savings account and custodial account for one of her children, and some merchandise returns. Although this chart is

| Amount | Spending | Notes |
|---|---|---|
| $63,583.50 | Cash withdrawals | 42 transactions, consisting of 32 counter/ATM withdrawals in DC and 10 in Maryland. The first withdrawal, for $5,000, was the same day Morgan received the EIDL funds. |
| $34,314.90 ($13,821.84 of which was at clothing stores) | Retail stores (to include Walmart, Amazon, Five Below, H&M, Zara) | It appears Morgan bought several wedding-related items in her shopping spree. |
| $15,998.29 | CashApp transfers | 50 transactions |
| $12,911.60 | Additional CashApp transfers | 52 transactions |
| $10,980.00 | Savings | |
| $4,983.25 | Travel | |
| $5,249.92 | Auto | |
| $4,470.05 | Debt Collection | |
| $3,670.47 | Entertainment | |
| $3,420.97 | Restaurants | |
| $2,060.88 | Groceries | |
| $1,864.52 | General | |
| $1,533.97 | Utilities | |
| $1,473.97 | Medical | |
| $1,208.40 | Fast Food | |
| $990.20 | Liquor | |
| $1,035.08 | Fuel | |
| $480.71 | Personal Care | |
| $193.88 | Moving | |
| $138.50 | Prison | This is seemingly a commissary. |
| $78.95 | Traffic Ticket | |

By February 26, 2021, less than eight months after receiving the funds, the defendant only had $2.19 remaining in her account into which the EIDL funds were deposited.

Furthermore, while the government has not argued for the §2B1.1(b)(12) enhancement and does not believe it applies, the government very much does believe that this Court can take into account the overall context in which the defendant's fraud occurred. The COVID-19 pandemic represented a severe threat to the vitality of small businesses across the country. In response to this nearly unprecedented threat to the livelihood of such firms, the SBA declared the pandemic to

---

not an exact tracing of the defendant's use of the EIDL funds, it demonstrates that the defendant spent the EIDL funds in ways inconsistent with supporting an agricultural or childcare business.

be an emergency and allowed businesses to apply for up to $2 million in loans at low-interest rates when credit would otherwise not be available, while also allowing them generous repayment plans to ensure loan repayments did not subsequently bankrupt them. "SBA to Provide Disaster Assistance Loans for Small Businesses Impacted by Coronavirus (COVID-19)," March 16, 2020, *available at* https://www.sba.gov/article/2020/mar/16/sba-provide-disaster-assistance-loans-small-businesses-impacted-coronavirus-covid-19. The defendant took advantage of the program's openness and generosity during a time in which so many businesses needed government support to survive and attempted to use those specially earmarked funds for herself. Not only did her fraud divert resources that could have been better allocated toward businesses in actual need of government support, but it also undermined the integrity of the program as a whole.

2. *History and Characteristics*

The defendant's history and characteristics do not readily reveal any reason why she would have been mentally or emotionally unable to avoid her criminal conduct in this instance, but rather suggest that she did what she did because she thought she could get away with it. While the defendant's childhood appears to have been quite challenging, she has obtained employment in adulthood, working for Instacart, as a resident assistant at an assisted living facility, and as a part-time delivery driver for UPS. PSIR at ¶¶ 63-65. And the defendant reports that she is currently employed as a certified nursing assistant. *Id.* at ¶ 62. The government acknowledges that the defendant is the mother of seven children, all of whom reside with her. *Id.* at ¶ 44. The government further notes that while the defendant has a comparatively minimal criminal history, she is currently charged with Second Degree Assault and Reckless Endangerment in Prince George's

County District Court. *Id.* at ¶ 36. In that pending matter, the defendant is alleged to have intentionally driven her vehicle into another woman. *Id.*

Given the defendant's ability to obtain gainful employment, there was no compelling need for the defendant to take $150,000 in EIDL funds for a fictitious agricultural or childcare business. Accordingly, the defendant's history and characteristics support the government's requested sentence.

### 3. Need for Sentence Imposed

The government believes that its proposed sentence of six months incarceration followed by six months of community confinement or home detention will best effectuate the purposes of sentencing as set forth in 3553(a)(2)(A)-(D), that is, for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence of criminal conduct; protect the public from further crimes of the defendant; and allow the defendant to obtain training, treatment, and other type of care she may require. The government believes that its recommendation of a sentence of six months incarceration followed by six months of community confinement or home detention accomplishes all of these goals. The defendant's conduct in this case, as described above, is serious: she defrauded the government into giving her $150,000 in supposed disaster recovery funds for her small business with no intent to actually use those funds for their approved purposes at the time of her application. The defendant then used those funds for purchases at retail stores, CashApp transfers to other individuals, automative repair expenses, debt collection payments, restaurants, and travel to Atlantic City New Jersey and Las Vegas, Nevada. Thus, the government's recommendation of a six-month carceral sentence followed by followed by six months of community confinement or home detention underscores the seriousness of this offense and the nature of the defendant's criminal conduct.

As important is the Court's consideration of the possible deterrent effect that a sentence in this matter may have on others contemplating committing this type of fraudulent scheme. Section 3553(a) is not limited to the necessary sentence to deter the defendant from engaging in further criminal conduct (specific deterrence), but also includes consideration of deterring other potential criminals from engaging in similar conduct (general deterrence). *See, e.g., United States v. Phinazee*, 515 F.3d 511, 515-16 (6th Cir. 2008) ("The plain language of the statute . . . also militates against limiting the authority of the court to specific deterrence. . . . We note that this conclusion comports with the longstanding and uncontroversial practice of considering general deterrence in sentencing."). From the standpoint of general deterrence, a non-carceral sentence will have very little deterrent effect on others and would suggest that obtaining public funds under false pretenses, immediately using them for your own benefit, and then leaving the government with the bill will merely result in a long period of mere supervision. Rather, the government's proposed sentence of six months of incarceration, followed by six months of community confinement or home detention, will send a message to all who seek to defraud that such acts will not be tolerated, and that rather than being supervised in the comfort of your own residence, would-be perpetrators will be removed from the community altogether.

    *4. Restitution and Forfeiture*

With respect to restitution, the crime of wire fraud is an "offense against property under" Title 18, and thus fall under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. As a result, the Court must order that "the defendant make restitution to the victim of the offense[s]." 18 U.S.C. § 3663A(a)(1). In this case, the Defendant, by virtue of her plea agreement, has agreed to pay back $148,900 to the SBA. The government will provide the relevant address and point of contact at the SBA to the Clerk's Office.

With respect to forfeiture, the Defendant has consented to the entry of a forfeiture money judgment in the amount of $148,900, in this case.

## IV.     CONCLUSION

WHEREFORE, for the foregoing reasons, the government respectfully recommends that this Court sentence the Defendant to a term of six months' incarceration, followed by six months of community confinement or home detention, followed by 36 months of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Will Hart*
Will Hart
Assistant United States Attorney
U.S. Attorney's Office for the
District of Columbia
D.C. Bar No. 1029325
601 D. St., N.W.,
Washington, D.C. 20530
William.hart@usdoj.gov
(202)-252-7877

*/s/ Benjamin Helfand*
Benjamin Helfand
Assistant United States Attorney
U.S. Attorney's Office for the
District of Columbia
D.C. Bar No. 1658708
601 D. St., N.W.,
Washington, D.C. 20530
Benjamin.Helfand@usdoj.gov
202-252-7059